# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL TYRONE McCULLON,** | : | **Civil No. 3:12-CV-445** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **( Judge Kosik)** |
| | : | |
| **LT. M. SAYLOR, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.   Statement of Facts and of The Case

#### A.   Procedural History

This is a *pro se* civil rights case that was brought by a federal prisoner, Tyrone McCullon, through the filing of a civil rights complaint on March 12, 2012, (Doc. 1), which he subsequently amended on September 9, 2012, to identify some previously unidentified John Doe defendants. (Doc. 37.)  In these complaints, McCullon alleged that prison officials violated his Eighth Amendment right to be free from cruel and unusual punishment by employing excessive force against him during, and after, a September 6, 2010 cell extraction. (Id.)

McCullon's complaints name fifteen defendants[1] and specifically allege as follows: First, McCullon alleges that defendants, M. Saylor, J. Hepner, Randy Johnson, W. McFadden, S. Gosa, Beverly Prince, William Brenneman, Reese, Carpenter, Booth, Lesho, Hicks Whittaker and Cross all used excessive force against him during a September 6, 2010 cell extraction at the United States Penitentiary, lewisburg. (Id.) McCullon then alleges that Defendant Saylor, as the lieutenant in charge of the use of force procedure on September 6, 2010, violated his Eighth Amendment rights because he permitted the use of force team to: (a) apply hand and leg restraints, and a belly chain, that were excessively tight; (b) drag him down a flight of stairs; and (c) place him in a cell that was covered in human feces. (Id.)

McCullon further contends that Defendant Gosa, who was the physician assistant that checked his restraints during the September 6, 2010 use of force procedure, was deliberately indifferent to his health and safety because, even though McCullon complained that the restraints were too tight, Defendant Gosa concluded that the restraints did not impair his circulation. McCullon then asserts that Defendants

_____

[1]McCullon's initial complaint named Defendant Lieutenant M. Saylor, Lieutenant J. Hepner, Lieutenant Randy Johnson, Lieutenant W. McFadden, Physician Assistant, S. Gosa; National CPR Coordinator, Beverly Prince; William Brenneman, R.N.; and Psychologist, D. Mink,. (Doc. 1.) McCullon's amended complaint identified the following members of the September 6, 2010 cell extraction team as defendants: Correctional Officers Reese, Carpenter, Booth, Lesho, Hicks Whittaker and Cross.

Hepner, Johnson and McFadden, who were the lieutenants responsible for checking his restraints between September 6, 2010, and September 7, 2010, violated his Eighth Amendment rights because they were deliberately indifferent to his well-being by disregarding his complaints that his restraints were too tight, and his requests to be transferred to a clean cell. (Id.)

Furthermore, in his complaint McCullon claims that Defendants Prince and Brenneman, medical defendants who checked McCullon's restraints on September 6, 2010, and September 7, 2010, also violated his Eighth Amendment rights because they too were deliberately indifferent to his health and safety when they disregarded his complaints that the restraints were too tight and his cell was covered in feces. (Id.) McCullon also alleges that Defendant Mink, a psychologist, falsified a Psychology Services Restraint Review Form dated September 7, 2010 at 8:41 a.m, and claims that she never met with him as reported. (Id.) Finally, McCullon asserts that all of the defendants conspired with each other and falsified their restraint check documentation in order to intentionally violate his Eighth Amendment rights.

On June 4, 2012, the defendants filed a motion to dismiss the complaint, or in the alternative for summary judgment. (Doc. 18.) This motion is supported by hundreds of pages of prison medical records, and by the prison video of this particular cell extraction, an immutable witness which precisely documents what occurred on

September 6, 2010. After extended pre-trial proceedings, (Docs. 18-40), this motion is now ripe for resolution.

### B. Factual Background

#### 1. Michael McCullon

Michael McCullon ("McCullon"), is a federal inmate who was incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania in September, 2010. (Doc. 24, ¶1.) McCullon's criminal history is marked by repeated episodes of violent behavior, and McCullon is currently serving a 262-month sentence for a crime of violence, bank robbery and possession of a firearm and ammunition by a convicted felon. (Id., ¶3.) Prior to September, 2010, McCullon also had an extensive prison disciplinary record within the federal prison system that was also marked by unrelenting violence and included multiple citations for offenses including assault, threatening bodily harm, insolence toward staff, refusing to obey an order, interfering with a security device by blocking food slot with arm, engaging in sexual acts, indecent exposure, refusing a work assignment, possessing an unauthorized item, being in an unauthorized area, and falsifying a statement. (Id., ¶¶4-7.)

#### 2. McCullon's September 6, 2010 Disciplinary Infractions

This case arose out of an incident which occurred in the United States Penitentiary, Lewisburg, on September 6, 2010. The nature of the triggering incident

that led to the events which inspire this lawsuit began with a truculent, disobedient act by McCullon, coupled with on-going profane and threatening resistence to correctional staff.

This escalating anger on McCullon's part was thoroughly documented by prison staff, and is acknowledged by the plaintiff. Thus, on September 6, 2010, at approximately 11:30 a.m., Supervisory Officer Murray issued an Incident Report against the plaintiff which charged McCullon with refusing to obey an order, and failure to follow safety and sanitation regulations. In this report, Officer Murray stated:

> At approximately 11:20 a.m. [on September 6, 2010] while doing a range tour I approached cell 308, and noticed that both window[s] had been covered and above the paper coverings I could see that the lights in the cell were covered also preventing me from seeing in the cell. I ordered inmate McCullon #71774-004 to remove the papers. Inmate McCullon refused to follow safety and sanitation regulations by replying, "you mother-fuckers, always talking about paper in the windows. Fuck the paper in the windows! Write the mother-fucking shot."

(Romano Decl. Ex. 1; DHO Packets Attach. J at 39.)

In his complaint, McCullon admits to the substance of this Incident Report stating:

> On[] 9-6-10 between 11:00 AM – 11:30 AM Correctional Officer Mr. J.E. Murray (while doing his fifteen minute cell checks in the Z-Block Unit on the 3rd Floor at U.S.P. Lewisburg SMU Program) approached my

cell #308 and demanded that I remove paper from my windows. The paper wasn't obstructing his view from seeing me (because it wasn't covering the entire window) and I advised him that I'd take it down after I finished using the toilet (i.e. defacating), and he could see me. C/O Murray returned five minutes later and yelled, "McCullon!" I warned you about that paper in your windows now I'm coming in to search your cell! I forgot to remove the papers in the windows and I was sitting at the desk doing legal work. I told C/O Murray, "I don't know who you're yelling at but I ain't cuffing up so you can come in here and destroy my legal papers." "And why are you harassing me about some paper in the windows?" My cell mate [] got out of the shower and removed the paper from the windows."

(Doc. 1 at 4.)

Presented with this profane refusal to obey the rule, a second officer attempted to secure McCullon's compliance. As documented in a second Incident Report this effort was also obscenely rebuffed. Thus, on September 6, 2010, at approximately 11:50 a.m., Officer Shearer issued an Incident Report which charged McCullon for refusing to obey an order, and stated:

On 9-6-10 at approx.. 11:40 a.m. I approached cell 308 and ordered inmate McCullon #71774-004 to come to the door and cuff up for a shakedown. Inmate McCullon refused to admit to hand restraints by saying, "I told ya mother-fuckers I'm not cuffing up for any y'all! Why you gotta be fuckin with me!!"

(Romano Decl. Ex. 1; DHO Packets Attach. J at 51.)

Presented with this persistent, profanity laced response, prison officials began to plan a cell extraction of McCullon. However, as part of that effort Lieutenant

Saylor endeavored to secure McCullon's voluntary compliance one more time. This effort was rebuffed by McCullon in graphic terms as documented by Lieutenant Saylor on September 6, 2010, when the liuetnant issued an Incident Report which charged McCullon with threatening another with bodily harm, which stated:

> On the above date and approximate time of 12:45 PM, I went to cell 308 of Z-Block, which is occupied by Inmates McCullon # 71774-004 and [cell mate]. I ordered Inmate McCullon to come to the cell door. Inmate McCullon replied, "Fuck you! My cellie ain't got nuttin to do wit dis! You go get your team and I'll show you what's up bitch!

(Romano Decl. Ex. 1, DHO Packet Attach. J at 61.)

In his complaint, McCullon admitted to this misconduct, stating, "Between 11:50 AM – 12:50 PM Lieutenant . . . , M. Saylor came to my cell door (309) and ordered me to cuff up so he, C/O Murray, and C/O Shearer could search my cell. I told Lt. Saylor that I wasn't cuffing up . . . ." (Doc. 1, at 4-5.)

### 3.    McCullon Is Removed From His Cell

McCullon's disobedient, profane and threatening behavior compelled an institutional response. Specifically, on September 6, 2010 a use of force team was assembled in response to the incident to remove McCullon from his cell. This use of force episode was videotaped and that video enables us to precisely identify what transpired during McCullon's cell extraction on September 6, 2010. Viewing the facts

in the light depicted by the videotape, see Scott v. Harris, 550 U.S. 372, 380-81 (2007), we find as follows:

Defendant Saylor was the use of force lieutenant over the use of force team responsible for McCullon's forced cell move on September 6, 2010. (Doc. 24, ¶68.) On September 6, 2010, at 12:53 p.m., Defendant Saylor assembled the use of force team and read the following statement to initiate the use of force procedure:

> We are currently in Special Management Unit, specifically Z-Block at USP Lewisburg, due to Inmate McCullon 71774-004, engaging in disruptive behavior and displaying signs of imminent violence. Specifically, at approximately 12:00 p.m., Inmate McCullon was ordered to submit to hand restaints and be removed from his cell so a cell search and security check could be conducted. Inmate McCullon refused staff's orders and stated, "You are not shaking me down. If you try, I will fuck you up." The inmate then covered his cell window, restricting staff's views into the cell to monitor the inmate's actions. I reported to Z-Block, Cell 308 and ordered the inmate to remove the paper from his window, to which he complied. I then ordered the inmate to submit to hand restraints and be removed from the cell so that it could be searched, which he refused. He then threatened violence towards any staff member who searched his cell. The inmate was extremely agitated and verbally aggressive while I was speaking with him. [Cell mate], was also assigned to Cell 308, Z-Block, and at this time is not engaging in any disruptive behavior, and is not a participant. Inmate McCullon is a thirty-five-year-old black male with an STG assignment of sex offender. Inmate McCullon has an extensive disciplinary history to include: assaults, refusing orders, interfering with security devices, possession of a dangerous weapon, engaging in sexual acts, and threatening. He is an in-custody, high-security level inmate. Inmate [cell mate] is a 44-year-old black male with an extensive disciplinary history to include: refusing orders, assault, threatening, fighting, and possession of a weapon. He is an in-custody, high-security level inmate. Warden Bledsoe has been briefed of the situation and has given authorization to assemble a use of

force team and place Inmate McCullon into ambulatory restraints due to his disruptive behavior and displaying imminent signs of violence. The Warden has also authorized the use of chemical munitions in the event Inmate McCullon becomes combative during the placement into ambulatory restraints. In the event that chemical agents is utilized, the inmates' medical records have been reviewed and the use of chemical agents is authorized. If chemical agents are utilized, we will decontaminate the inmates in Cell 317, Z-Block third floor.

(Id., ¶ 69.)

The use of force team in this instance consisted of Defendant Saylor, seven correctional staff, a case manager, a physician's assistant, and two camera operators. (Id., ¶70.) During the use of force procedure on September 6, 2010, each staff member had specific responsibilities designed to ensure that McCullon was subdued with a minimum of violence. (Id., ¶¶71- 76.) Further, it was the duty of the case manager to attempt to gain voluntary cooperation from McCullon with the use of confrontation avoidance techniques, (Id., ¶77), and it was the duty of a physician's assistant to provide medical backup for the use of force team. (Id., ¶78.)

Prior to initiating the use of force procedure on September 6, 2010, Defendant Saylor carefully instructed staff on their duties and responsibilities stating that:

Team members are reminded that conversation will be kept to an absolute minimum during the move except to verbalize that the restraints are secure. Team members, make one final check of your equipment to ensure that you have all of your required equipment, and that it is functional. The camera operators are reminded to focus on the actions of the inmate as well as the application of the restraints. Following this briefing, the team will be moved to Z-Block, Cell 308. When the team

assembles at the cell door, I will have confrontation avoidance attempted. If confrontation avoidance fails, I will give Inmates McCullon and [cell mate] one last order to comply with placement of hand restraints. If they do not comply with my orders, I will dispense chemical agents into the cell until the inmates comply with my orders. The team will remove the inmates from the cell block and escort them to Cell 317, where they will be visually searched, metal detected, placed in new clothes, and placed in ambulatory restraints. The team will then escort Inmate McCullon to Cell 124, Dog Block, where he will remain in ambulatory restraints. Inmate [cell mate] will be placed back into Cell 308 if he remains a non-participant during this calculated use of force.

(Id., ¶79.)

When the use of force team assembled at Cell 308 on September 6, 2010, they made an effort to avoid confrontation with the case manager calling out to the plaintiff, "McCullon, I need you to come over here and submit to restraints." (Id., ¶80.) McCullon replied to the case manager in an agitated manner, "I want to state my claim. I want to state my claim. I want to state my claim to the camera crew," (id. ¶81), to which the case manager responded, "Are you going to submit to restraints or not?" (Id. ¶82.)

When McCullon refused to cooperate with the case manager, Lieutenant Saylor stepped to the door of Cell 308 and stated, "Inmate McCullon, turn around, place your hands out the slot." (Id. ¶83.) McCullon replied by shouting at Defendant Saylor, "I say [cell mate] ain't got nothing to do with this. [Cell mate] ain't got nothing to do with this. Now I want that on camera." (Id. ¶84.) Lieutenant Saylor then retrieved the

canister of chemical agents, at which time McCullon relented and shouted, "My hands are right here. All you need to do is open the slot." (Id. ¶85.)  Lieutenant Saylor then instructed McCullon to, "[p]ut your hands in the food slot right now." (Id. ¶86.) When McCullon replied, "The fuckin' food slot ain't open." Lieutenant Saylor instructed him to, "Turn around. Stick your hands through the slot," at which time McCullon submitted to hand restraints. (Id. ¶¶87-88.)

After McCullon's cell-mate also submitted to hand restraints, the door to Cell 308 was opened, McCullon was removed without incident by members of the use of force team, and was escorted to Cell 317.(Id., ¶¶89-90.)  Ambulatory restraints were then applied to McCullon in Cell 317. (Id., ¶¶91-92.)  When McCullon stated that the restraints were too tight, his fingers were numb, and he could not feel his fingers, staff were immediately attentive to this concern. Thus, Lieutenant Saylor personally checked McCullon's restraints.  Defendant Gosa, a physician's assistant, also checked McCullon's restraints and stated that McCullon's circulation was good. (Id., ¶¶94-96.) Once prison staff received this medical clearance they then proceeded with the cell extraction.

The entire use of force team then escorted McCullon out of Cell 317, down the corridor to the stairs. During this portion of the prisoner transport McCullon made no complaint, and displayed no physical distress of any time. Indeed,  during which time,

McCullon remained silent. (Id., ¶97.) As the use of force team was escorting McCullon down two flights of stairs, McCullon became agitated and complained that the restraints were too tight, and was told by Lieutenant Saylor: "Inmate McCullon, allow my team to guide you. Do not resist the officers." (Id.¶¶98-99.) The use of force team was then able to escort McCullon without any further incident through the main corridor of the first floor at U.S.P. Lewisburg, and into the D-Block corridor, and into Cell 124. McCullon, once again, did not display any further distress and remained silent throughout this portion of the move. (Id., ¶100.) As the use of force team was placing McCullon in Cell 124, Lieutenant Saylor stated, "Inmate McCullon, sit on the bed and remain on the bed until my team mates have exited the cell. Team out." (Id., ¶101.)

At the conclusion of this cell move on September 6, 2010, the prison staff members conducted a debriefing on camera. (Id., ¶104.) During the debriefing following the September 6, 2010 use of force on McCullon, Defendant Saylor stated:

> The time is now 1:13 p.m. The calculated use of force has been completed. Confrontation avoidance was unsuccessful with Inmate McCullon and [cell mate]. However, when I gave them one last order to be placed in hand restraints, they complied. Inmate McCullon was escorted to Cell 317 where he was visually searched, metal detected, placed in new clothes, and placed in ambulatory restraints. He was then escorted to Dog Block Cell 124 where he will remain in ambulatory restraints until the desired calming effect of the restraints has been achieved. [Cell mate] did not participate at any time in any disruptive behavior. Therefore, he was placed back into Cell 308 in Z-Block.

(Id. ¶105.)

This cell extraction concluded on September 6, 2010 at 1:16 p.m. None of the use of force team members sustained injury or lost equipment during the cell extraction. (Id., ¶¶106 and 107.) Moreover, there is no indication from the video that McCullon was placed in a cell that was not fit for habitation at the close of this cell extraction.

## 4.     McCullon Remains In Restraints for 24 Hours

Following this cell removal, McCullon remained in restraints for approximately 24 hours, from September 6-7, 2010. This measure was undertaken in accordance with prison policy which directs that when use of restraints is necessary, the restraints should remain in place on the inmate until the prisoner regains his self-control. (Id., ¶¶110-116.) That policy expressly called for the continued restraints following physically disruptive behavior and approved the use of ambulatory restraints for a period of time in order to protect staff and others, pending an assessment by staff to determine whether the inmate has regained self-control. (Id.) When an inmate is placed in ambulatory restraints, prison policy directs that staff shall check on the restrained inmate at least every fifteen minutes.(Id.) During these fifteen-minute restraints checks staff are required to describe the inmate's behavior, including verbal and non-verbal comments, and to notify health/psychology services or supervisors for

assistance as needed.(Id.) In this case, prison staff performed the fifteen-minute restraints checks on McCullon during the entire time that he was restrained between September 6 and 7, 2010. (Id.)

Prison policy sets further safeguards on inmates who are being held in restraints. Under this policy when an inmate is placed in ambulatory restraints, a lieutenant must assess the inmate every two hours and, "[t]he goal of the two-hour reviews is to determine, as soon as possible, that the inmate has regained self-control and may be placed in lesser restraints." (Id.) Prison policy also requires that when an inmate is placed in ambulatory restraints, qualified health personnel must initially assess the inmate to ensure appropriate breathing and response, and to ensure that the restraints have not restricted or impaired the inmate's circulation. (Id.) Qualified health personnel are then to visit the restrained inmate at least twice during each eight-hour shift, and must document the following: date and time of examination; examining staff member; body position; restraints and adequate circulation; vital signs; medication; injuries; the inmate's intake, output, and hydration; along with any possible medical reasons for behavior; deterioration of inmate's health; and any other significant findings and comments. (Id.)

In this case, the prison records of the oversight and care afforded to McCullon while he was restrained reveal that his health and safety were closely monitored while

he was briefly held in restraints. Thus, prison records document that staff performed all of the required fifteen-minute restraints checks on McCullon. (Id., ¶116 and 120.) During many of these restraint checks, McCullon acted out aggressively; thus, when staff performed the fifteen minute restraints checks on September 6, 2010, at 1:15 p.m., 1:30 p.m., 1:45 p.m., and 2:15 p.m., McCullon was yelling out the door. (Id., ¶117.) When staff performed the fifteen minute restraints checks on September 6, 2010, at 2:30 p.m., 2:45 p.m., 3:00 p.m., 3:15 p.m., 4:30 p.m., 4:45 p.m., 11:30 p.m., and 11:45 p.m., McCullon was standing at the cell door. (Id., ¶118.)

Prison lieutenant and medical personnel also conducted regularly scheduled evaluations of McCullon throughout this twenty four hour period. These examination began moments after this cell extraction was concluded on September 6, 2010, when Physician Assistant Gosa entered his initial assessment into McCullon's medical records at 2:30 p.m., an assessment which noted: (1) McCullon reported no injury, and no injury was observed; (2) McCullon had no bleeding or bruising; (3) although McCullon reported that the restraints were tight, there was no evidence of joint pain, muscle aches, wrist pain, dislocations, fractures, spinal injury, sprains, stiffness, swelling, numbness, pain, or abnormalities in circulation; (4) although McCullon was irritable and anxious, he otherwise appeared well, was alert and oriented, and did not appear to be in pain; (5) and McCullon had no swelling, hematomas, lacerations,

abrasions, puncture wounds, hemorrhage, or ecchymosis. (Id., ¶148.) Lieutenant Hepner also performed a two-hour lieutenant restraints check On September 6, 2010, at 2:00 p.m., at which time he noted that McCullon had used the toilet and wrote: "Inmate remains agitated and verbally aggressive. Has not regained self control. Action taken: Continue restraints." (Id., ¶149.)

Two hours later, at 4:00 p.m., medical staff came to cell #124 of the D-Block Unit with Lieutenant R. Johnson to check McCullon's ambulatory restraints. While McCullon alleged that he complained about the restraints at that time, prison records described a more routine encounter noting: "I/M restraints checked. I/M checked by medical. I/M agitated towards staff. Attitude poor during this check. Action Taken: Remain in restraints, " and the medical assessment conducted at that time discloses that: (1) McCullon was standing; (2) the restraints caused "no vascular compromise"; (3) McCullon had a strong pulse; McCullon had no injuries; (4) and that the cuffs were loosened for him. (Id., ¶¶151-153.) Moreover, medical records which correspond to this restraints check at 4:00 p.m. on September 6, 2010, indicate that, while McCullon complained of aching pain in his left wrist that he rated at a level of five, his pulse was regular at eighty-seven beats per minute, he had normal respirations, appeared well and was anxious, and that he had normal radial pulse and capillary refill in his arms and legs. (Id.)

Lieutenant Johnson then conducted restraints checks at 6:00 p.m. and 8:00 p.m. on September 6, 2010, at which time he observed nothing unusual about McCullon's restraints but noted that McCullon's attitude remained poor. (Id., ¶¶157-158.) Defendant Prince also performed a health services restraints check for McCullon on September 6, 2010, at 8:00 p.m., at which time she recorded that McCullon was seated, he had a strong radial pulse, appeared to be healthy, and offered no medical complaints. Medical reports that correspond to Defendant Prince's restraints check on September 6, 2010, at 8:00 p.m. state that McCullon offered no medical complaints, had regular radial pulse at sixty-eight beats per minute, appeared well and in no pain or distress, was pleasant and cooperative, had normal respiration, and had normal radial pulse and capillary refill in his arms and legs. (Id., ¶¶159-160.)

These restraints checks continued throughout the next twelve hours. Thus, Defendant Johnson performed a two-hour lieutenant restraints check on September 6, 2010, at 10:00 p.m., at which time he wrote: "I/M restraints checked. I/M was asked questions but refused to speak to staff. Attitude poor. Action Taken: Remain in restraints." Defendant McFadden performed a two-hour lieutenant restraints check on September 7, 2010, at 12:00 a.m., during which he observed that: "McCullon intentionally ignored me during check. He spoke to med staff but refused to respond to any of my questioning. Action Taken: Remain in restraints." Defendant Prince also

performed a health services restraints check for McCullon on September 7, 2010, at 12:01 a.m., at which time she recorded that McCullon: (1) was seated; (2) had adequate circulation at sites of the restraints; (3) had a strong radial pulse; (4) appeared to be healthy; and (5) offered no medical complaints. These medical findings were underscored by other prison medical records that correspond to Defendant Prince's restraints check on September 7, 2010, at 12:01 a.m. These records indicate that McCullon offered no medical complaint, had a regular radial pulse at eighty-eight beats per minute, appeared well and in no pain or distress, was pleasant and cooperative, had normal respiration, and had normal radial pulse and capillary refill in his arms and legs. (Id., ¶¶161-164.)

Similarly, when Defendant McFadden performed a two-hour lieutenant restraints check on September 7, 2010, at 2:00 a.m., he found that, " McCullon again refused to respond to my questioning. Action Taken: Remain in restraints." McCullon's truculence continued throughout the morning of September 7, 2010. For example, when Defendant McFadden performed a two-hour lieutenant restraints check on September 7, 2010, at 4:00 a.m., he noted, "McCullon continues to intentionally ignore me during checks. Action Taken: Remain in restraints." Further, when Defendant McFadden performed a two-hour lieutenant restraints check on September 7, 2010, at 6:00 a.m., he found that, "McCullon has refused to respond to any of my

questioning during entire shift. Action Taken: Remain in restraints." McCullon, however, continued to receive medical care and attention throughout September 7, 2010. For example, on September 7, 2010, at 6:30 a.m., Defendant Lieutenant Brenneman performed a health services restraints check on McCullon, at which time he recorded that McCullon: (1) was standing; (2) refused a restraints check; (3) appeared to be healthy; and (4) stated, "I'm good." Medical records that correspond to Defendant Brenneman's restraint check on September 7, 2010, at 6:30 a.m. indicate that McCullon offered no complaints, that he appeared well and was alert and oriented, and state that, "[McCullon] offered evaluation due to being in ambulatory restraints. Refused at this time stating 'I'm good.' " (Id., ¶¶165-170.)

Further, when Defendant Hepner performed a two-hour lieutenant restraints check on September 7, 2010, at 8:00 a.m., he recorded that McCullon had used the toilet, and wrote: "Inmate refuses to speak with me during check. Unable to determine if he has regained self control. Action Taken: Continue restraints." McCullon's erratic behavior led to a psychology services restraint check on September 7, 2010 at 8:41 a.m. conducted by Defendant Mink, at which time she noted: (1) McCullon has a history of bi-polar disorder, prior use of psychotropic medication, and a history of prior suicide attempt; (2) McCullon offered no complaints or concerns; (3) McCullon was alert, oriented and cooperative; (4) McCullon's speech was coherent and goal-

directed; (5) McCullon's mood was stable; (6) McCullon could remain in restraints until a sustained period of appropriate/compliant behavior was demonstrated; and (7) there was no indication that McCullon's behavior was reflective of mental health problems. (Id., ¶¶171-172.)

Defendant Hepner then performed a two-hour lieutenant restraints check on September 7, 2010, at 10:00 a.m., at which time he recorded that McCullon had used the toilet and wrote, " Inmate continues to refuse to speak during check. Unable to determine if he has regained self control. Appears passive aggressive. Action Taken: Continue restraints." At this time Defendant Brenneman also performed a health services restraints check on McCullon and observed that McCullon: (1) was sitting; (2) his circulation was intact at the sites of the restraints; (3) was not injured; (4) had positive radial pulse; and (5) appeared healthy. McCullon's medical records of Defendant Brenneman's restraint check on September 7, 2010, at 10:00 a.m. confirm that McCullon voiced no complaints; he had a regular radial pulse at beats per minute, he appeared well; he was not pleasant, but cooperated with the examination; he had normal radial pulse and normal capillary refill in his arms and legs, and was in no apparent distress. Defendant Hepner then performed a two-hour lieutenant restraints check on September 7, 2010, at 12:00 p.m., at which time he recorded that McCullon had used the toilet, and wrote, "Inmate speaking calmly with staff. Appears he has

regained self control. Action Taken: Remove restraints." (Id., ¶¶174-177.) This episode then drew to a close.

Two days later, on September 9, 2010. McCullon was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri. During the flight to Springfield on September 9, 2010, Correctional Officer D. Bardo accompanied McCullon and the other inmate, and was assigned to place the inmates in restraints for the trip. Throughout the flight, which lasted approximately five to six hours, McCullon and the other inmate were restrained with handcuffs, leg irons and a martin chain around his waist. Correctional Officer Bardo does not recall McCullon having any injuries on his hands and arms on September 9, 2010. (Id., ¶¶180-195.)

When he arrived at Springfield, McCullon told staff that he had sustained the injuries to his wrists during the restraints procedures at Lewisburg on September 6, 2010, and September 7, 2010. Objective medical assessments, however, failed to confirm significant and recent injuries to McCullon. Medical records indicate that a physician's assistant performed a health screen on McCullon at Springfield on September 9, 2010, at which time McCullon reported his current medical conditions as, "Right knee old injury with pain and swelling. Recent MRI showed loose bodies. [A]lso Hx. right hand injury." The medical records of the September 9, 2010 health screen indicate, however, that McCullon had no draining skin lesions, no signs of

recent trauma, no signs of open rash, no open sores, no wounds, and no body deformities. (Id., ¶¶186-189.) Follow up examination on September 17, 2010, also indicated that McCullon had no draining skin lesions, no signs of recent trauma, no signs of open rash, no open sores, no wounds, and no body deformities. (Id.) Thus, there were no objective medical findings to support a claim of serious, recent injury to McCullon.

### 5. McCullon is Disciplined for Resisting Staff

Following this episode, McCullon was cited for violating prison rules by resisting staff. At the close of these disciplinary proceedings, the prison Disciplinary Hearing Officer found that McCullon had violated prison rules and sanctioned McCullon. It is against this factual background, a factual background largely viewed in the light depicted by the videotape, see Scott v. Harris, 550 U.S. 372, 380-81 (2007) that we now assess the defendants' summary judgment motion.

### II. Discussion

### A. Rule 56–The Legal Standard.

The defendants have filed a motion to dismiss, or in the alternative for summary judgment. In this case, however, all parties have treated this motion as a summary judgment motion. Therefore, we will assess this motion under the standards which govern summary judgment motions.

Rule 56(a) of the Federal Rules of Civil Procedure, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley

Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with

particular force to parties who attempt to rely upon hearsay statements to establish

material issues of fact which would preclude summary judgment. With respect to such

claims, it is well-settled that: "In this circuit, hearsay statements can be considered on

a motion for summary judgment [only] if they are capable of admission at trial."

Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n.2 (3d Cir.

2000), citing Stelwagon Mfg. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275, n.17

(3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a
> court may only consider evidence which is admissible at trial, and that
> a party can not rely on hearsay evidence when opposing a motion for
> summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561
> (E.D.Mo.1996). Additionally, a party must respond to a hearsay
> objection by demonstrating that the material would be admissible at trial
> under an exception to hearsay rule, or that the material is not hearsay.
> See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003).
> The mere possibility that a hearsay statement will be admissible at trial,
> does not permit its consideration at the summary judgment stage. Henry
> v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa.

Aug. 26, 2005). Thus, a party may not rely upon inadmissible hearsay assertions to

avoid summary judgment. Therefore, where a party simply presents inadmissible

hearsay declarations in an attempt to establish a disputed material issue of fact, courts

have typically rebuffed these efforts and held instead that summary judgment is

appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL

2043184 (E.D.Pa. July 12, 2007); <u>Bouriez v. Carnegie Mellon Univ.</u>, No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); <u>Carpet Group Int'l v. Oriental Rug Importers Assoc., Inc.</u>, 256 F.Supp.2d 249 (D.N.J. 2003).

Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." <u>Thimons v. PNC Bank, NA</u>, 254 F.App'x 896, 899 (3d Cir. 2007)(citation omitted). Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." <u>Fireman's Ins. Co. Of Newark NJ v. DuFresne</u>, 676 F.2d 965, 968 (3d Cir. 1982), <u>see</u> <u>Sunshine Books, Ltd. v. Temple University</u>, 697 F.2d 90, 96 (3d Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d Cir. 1969). Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d Cir. 1981)).

Finally, a party who seeks to resist a summary judgment motion must also comply with Local Rule 56.1, which specifically directs a party opposing a motion for summary judgment to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant],

as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted." L.R. 56.1.Under the local rules, the failure to follow these instructions and appropriately challenge the material facts tendered by the defendant means that those facts must be deemed, since:

> A failure to file a counter-statement equates to an admission of all the facts set forth in the movant's statement. This Local Rule serves several purposes. First, it is designed to aid the Court in its determination of whether any genuine issue of material fact is in dispute. Second, it affixes the burden imposed by Federal Rule of Civil Procedure 56(e), as recognized in Celotex Corp. v. Catrett, on the nonmoving party 'to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, *designated specific facts showing that there is a genuine issue for trial*.' 477 U.S. 317, 324 (1986) (internal quotations omitted) (emphasis added).

Doe v. Winter, No. 04-CV-2170, 2007 U.S. Dist. LEXIS 25517, *2 n.2 (M.D. Pa. Apr. 5, 2007) (parallel citations omitted; court's emphasis). A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a *pro se* litigant. These rules apply with equal force to all parties. See Sanders v. Beard, No. 09-CV-1384, 2010 U.S. Dist. LEXIS, *15 (M.D. Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, No. 02-CV-01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D. Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

Furthermore, in a case such as this, where critical events at issue have been captured on videotape, the Court is obliged to consider that videotaped evidence in determining whether there is any genuine dispute as to material facts. In fact, it is clear that, in this setting, we must view the facts in the light depicted by the videotape. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape."). This principle applies with particular force to inmate excessive force claims which entail videotaped encounters with staff. Where a videotape refutes an inmate's claims that excessive force was used against him, and the video evidence does not permit an inference that prison officials acted maliciously and sadistically, summary judgment is entirely appropriate. Tindell v. Beard, 351 F.App'x 591 (3d Cir. 2009).

**B.    Constitutional Standards Governing Eighth Amendment Claims.**

In conducting this legal analysis we must also be mindful of the constitutional standards which govern Eighth Amendment claims, since McCullon advance two distinct Eighth Amendment claims against the remaining defendants in his complaint. In our view, McCullon alleges, with varying degrees of clarity, constitutional claims

under the Eighth Amendment, asserting at various times that prison staff violated his

Eighth Amendment rights by: (1) using excessive force against him; and by (2)

displaying deliberate indifference to his medical needs while he was briefly restrained.

Each of these Eighth Amendment claims is, in turn, judged against settled legal

principles, principles which set precise and exacting standards for asserting a

constitutional infraction. All of the various claims, however, are governed by the same

overarching and animating constitutional benchmarks. As the United States Court of

Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." <u>Whitley v. Albers</u>, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." <u>Id</u>. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." <u>Id.</u>

> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." <u>Wilson v. Seiter</u>, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. <u>Id</u>. at 298, 111 S.Ct. 2321. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. <u>Id</u>. In other

words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

With these tenets in mind we turn to a consideration of the individual Eighth Amendment claims advanced here by McCullon.

## 1. **Excessive Force Claims**

At the outset, Eighth Amendment excessive force claims entail a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law.

In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he

caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Moreover, in assessing such claims in a case where an encounter is captured on videotape we are mindful of the fact that when "videotape refutes [an inmate's] assertion that defendant[s] used excessive force," or when the "video shows that [an inmate] did not suffer any physical distress, and a medical report indicates that he had no visible swelling or injuries," we should conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically," and may enter summary judgment on an excessive force claim. Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

Further, in the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is

appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

## 2. **Deliberate Indifference Claims**

Beyond his claims that he was subjected to excessive force by staff, McCullon also seems to allege that prison officials left him in physical restraints for an excessive period of time. Inmate Eighth Amendment claims involving the "prolonged use of restraints. . . [are] more properly analyzed under the [Eighth Amendment's] deliberate indifference standard. See A.M. ex. rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372 F.3d 572, 587 (3d. Cir.2004) (deliberate indifference standard appropriate where it did not appear that officials 'were required to make split-second decisions to maintain or restore order through the use of excessive physical force'); Howard v. Bureau of Prisons, Civ. A. No. 3:05–CV–1372, 2008 WL 318387, at *13 (M.D.Pa. Feb.4, 2008) ('Outside the context of a prison disturbance, which is characterized as "a single instance of prisoner unrest where there is a need to act quickly," Eighth Amendment claims are judged by the deliberate indifference standard.'); Trammell v. Keane, 338 F.3d 155, 162–63 (2d Cir.2003) (applying deliberate indifference standard in determining whether deprivation orders, depriving prisoner of certain amenities, were reasonably calculated to restore prison discipline and security)." Womack v. Smith, 1:06-CV-2348, 2011 WL 819558 (M.D. Pa. Mar. 2, 2011. Under

this Eighth Amendment analytical paradigm, Courts recognize that prison officials may not be deliberately indifference to harms or injuries suffered by inmates. In Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001), the Court of Appeals explained the basic requirements of deliberate indifference claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

Id. at 125 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)). Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety." Id. This deliberate indifference standard "is a subjective standard under Farmer – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety." Id. Thus, " '[d]eliberate indifference can be shown when a prison official *knows of and disregards* an excessive risk to inmate health or safety' Hamilton v. Leavy, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks omitted)(emphasis added). Accordingly, "to survive summary judgment on an Eighth Amendment claim asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that

risk; and (3) causation." <u>Davis v. Williams</u>, 354 F. App'x 603, 605-606 (3d Cir. 2009).

As explained in <u>Beers-Capitol</u>, in Eighth Amendment cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known." <u>Id.</u> at 131. Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837). This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" <u>Id.</u> (quoting <u>Farmer</u>, 511 U.S. at 837).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care. In the medical context, a constitutional violation under the Eighth Amendment occurs only when officials are deliberately indifferent to an inmate's serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 105

(1976). To establish a violation of his constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally

not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. James, 230 F. App'x at 197-98(citations omitted). In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is

disavowed by courts since such determinations remain a question of sound professional judgment. <u>Inmates of Allegheny County Jail v. Pierce</u>, 612 F.2d 754, 762 (3d Cir. 1979) (quoting <u>Bowring v. Godwin</u>, 551 F.2d 44, 48 (4th Cir. 1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth Amendment in a prison medical setting. In a case such as this, where the inmate received on-going medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." <u>Durmer v. O'Carroll,</u> 991 F.2d 64, 69 (3d. Cir. 1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims. See, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez, No. 08-2217, 2010 WL 569852 (M.D. Pa. Feb. 11, 2010); Hodge v. United States. No. 06-1622, 2007 WL 2571938 (M.D. Pa. Aug. 31, 2007).

Furthermore, it is important to note that these constitutional protections are only triggered by excessive and prolonged confinement in restraints. Thus, courts have recognized that brief periods in restraints of twenty-four hours or less typically will not give rise to an Eighth Amendment deliberate indifference claim. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours);

Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003) (24 hours in ambulatory restraints, no Eighth Amendment violation).

### C.    The Defendants Are Entitled to Summary Judgment

### 1.    McCullon's Excessive Force Claims Fail

Guided by these benchmarks, we conclude that the defendants are entitled to summary judgment in this case on McCullon's Eighth Amendment excessive force claims since the immutable witnesses, the videotape evidence, plainly "refutes [McCullon]'s assertion that defendant[s] used excessive force," and we conclude "viewing the evidence in the light most favorable to [the inmate that], no reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009).

Indeed, with respect to McCullon's excessive force claims arising out of his cell extraction, there is nothing in the videotape depiction of this procedure that could even remotely be characterized as in any way malicious or sadistic, the essential

prerequisite to an Eighth Amendment violation. Quite the contrary, the video is striking and notable for the restraint exhibited by correctional staff, and for the care and attention which they give to McCullon. We must view the facts in the light depicted by the videotape, and may not indulge in the "visible fiction" that is McCullon's version of events, which is plainly contradicted by the video, in order to find a genuine and disputed issue of fact. See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.") Viewing these events through this analytical prism, and having carefully observed this videotape, it is simply impossible to say that any " reasonable finder of fact could view the video of the incident and determine that [defendants] acted maliciously and sadistically." Tindell v. Beard, 351 F. App'x 591, 596 (3d Cir. 2009). Therefore, summary judgment is appropriate here on behalf of all defendants as to this claim.

## 2. McCullon's Deliberate Indifference Claims Are Also Unavailing

Nor can McCullon sustain a deliberate indifference claim based upon the fact that he was held in restraints for approximately twenty-four hours after this angry

outburst. At the outset, the duration of this period of restraint–24 hours–simply does not implicate grave Eighth Amendment concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair); Moore v. Miller, No. 7:08CV00614, 2009 WL 113258 (W.D.Va. Jan.15, 2009) (26 hours); Keyes v. O'Brien, No. Civ. A. 7:06CV00437, 2006 WL 2125912 (W.D.Va. July 27, 2006) (no Eighth Amendment violation where prisoner placed in ambulatory restraints for 30 hours); Garraway v. United States, No. 04–CV–01049, 2006 WL 3054606, at *8 (D.Colo. July 24, 2006) (50 hours in ambulatory restraints); Saleh v. Ray, No. Civ. A. 02–3214, 2003 WL 23484639, at * 6 (D.Kan.2003) (24 hours in ambulatory restraints, no Eighth Amendment violation)**.**

Moreover, the use of these restraints was both reasonable and necessary in light of McCullon's violent behavior and agitated demeanor on September 6-7, 2010. Indeed, it is undisputed that staff used the restraints in a measured fashion, and in a manner which was directly linked to the penological goals of ensuring institutional

safety, as illustrated by the fact that the restraints were removed shortly after McCullon gained control of his emotions, and was able to present in a rational and non-threatening manner. Furthermore, the meticulous care and attention which McCullon received from prison medical and correctional staff while in restraints belies any claim of deliberate indifference to his physical needs. In sum, the use of restraints here was in direct response to McCullon's violent behavior. Those restraints were employed for a limited period of time, and were removed promptly once McCullon exhibited behavior which indicated that he no longer presented a threat to himself, fellow inmates, or staff. On these facts, a deliberate indifference claim fails, and the defendants are entitled to summary judgment in their favor.

In addition, we note that the use of these restraints was closely monitored by medical personnel throughout September 6-7, 2010, and those medical staff observed no medical reason to remove these restraints. Since it is axiomatic that correctional staff cannot be held deliberately indifferent when the defer to medical personnel on medical matters, Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993), this fact also compels summary judgment in favor of these defendants on this deliberate indifference claim.

Moreover, as to the medical staff named as defendants, the undisputed factual record plainly shows that they treated and assessed McCullon's health on a regular

basis during this twenty-four hour period, but simply observed nothing remarkable which required medical intervention. Thus, McCullon's complaints about these health care matters, in essence, entail nothing more than a medical disagreement this prisoner and medical staff concerning which type of care he should have received while held in these restraints. Where an inmate's complaint consists of little more than a medical care dispute with medical professionals, a deliberate indifference claim fails and prison medical officials are entitled to a judgment in their favor as a matter of law. See e.g., Gause v. Diguglielmo, 339 F.App'x 132 (3d Cir. 2009)(dispute over choice of medication does not rise to the level of an Eighth Amendment violation); Innis v. Wilson, 334 F.App'x 454 (3d Cir. 2009)(same); Whooten v. Bussanich, 248 F.App'x 324 (3d Cir. 2007)(same); Ascenzi v. Diaz, 247 F.App'x 390 (3d Cir. 2007)(same).

Finally, to the extent that McCullon attempts to lodge a conditions of confinement claim based upon an assertion that the cell in which he was briefly housed on September 7, 2010 was soiled, this claim fails. "When an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, we must determine if prison officials acted with 'deliberate indifference' to the inmate's health. Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The objective inquiry is whether the inmate was 'denied the minimal

civilized measure of life's necessities.' <u>Hudson</u>, 503 U.S. at 9, 112 S.Ct. 995."<u>Fuentes</u>

<u>v. Wagner</u>, 206 F.3d 335, 345 (3d Cir. 2000). In this setting, it is clear that:

> The Eighth Amendment prohibits punishments inconsistent with "evolving standards of decency that mark the progress of a maturing society." <u>Estelle v. Gamble</u>, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting <u>Trop v. Dulles</u>, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Conditions of prison confinement violate the Eighth Amendment only if they "deprive inmates of the minimal civilized measure of life's necessities." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)

<u>Atkinson v. Taylor</u>, 316 F.3d 257, 272 (3d Cir. 2003).

Thus, these claims also require proof of a both culpable state of mind, and objective proof of physical conditions of confinement which shock the conscious and depart from minimal civilized standards of life's necessities. Applying these benchmarks, Eighth Amendment claims, like those made here, which rest upon a brief alleged failure to provide hygienic housing conditions to a prisoner do not state a claim under the Eighth Amendment. <u>See e.g.</u>,<u>Banks v. Mozingo</u>, 423 F.App'x 123 (3d Cir. 2011)(denying inmate hygiene complaint as ironic where inmate engaged in un-hygienic behavior, including smearing feces on cell); <u>Adderly v. Ferrier</u>, 419 F.App'x 135 (3d Cir. 2011)(denying inmate claim involving 7 day alleged denial of hygienic material); <u>Fortune v. Hamberger</u>, 379 F.App'x 116 (3d Cir. 2010)( denying inmate claim involving 15 day alleged denial of hygienic material); <u>Benjamin v. Fraser</u>, 161 F.Supp.2d 151, 177 (S.D.N.Y.2001) (two days without feminine hygiene products and

toilet paper did not establish a constitutional violation); <u>Stead v. Skinner</u>, 10-4526, 2011 WL 3882809, *4 (N.D.Ill., Sept 2, 2011).

Moreover, and more fundamentally, nothing about the condition of the cell into which McCullon was placed on September 6, 2010, as depicted in the prison cell extraction video, shocks the conscience or appears to deprive McCullon of the minimal civilized measure of life's necessities. While the condition of the cell doubtless declined during McCullon's brief reisdence there, these matters which were brief in duration do not rise to the level of a constitutional infraction.

### 3.    <u>Qualified Immunity</u>

But even if McCullon had stated a colorable constitutional claim relating to his cell extraction, the defendants would still be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim McCullon must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that McCullon is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>see also</u> <u>Pearson v. Callahan</u>, 555 U.S. 223 (2009). This doctrine, known as qualified

immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201-02. The Supreme Court has instructed that a right is clearly established for purposes

of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  <u>Williams</u>, 455 F.3d at 191 (citing <u>Saucier</u>, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." <u>Wilson</u>, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002) (quoting <u>United States v. Lanier</u>, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  <u>Wilson</u>, 455 F.3d at 191 (quoting <u>Hope</u>, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries sequentially, <u>Pearson</u>, 555 U.S. at 239-40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. <u>Id.</u> Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the

deprivation of federal rights for purposes of qualified immunity. <u>Gruenke v. Seip</u>, 225 F.3d 290, 299-300 (3d Cir. 2000); <u>Crouse</u>, 668 F. Supp. 2d at 671; <u>see also</u> <u>Grant v. City of Pittsburgh</u>, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. <u>See</u> <u>Montanez v. Thompson</u>, 603 F.3d 243 (3d Cir. 2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, summary judgment is entirely appropriate. <u>Gilles v. Davis</u>, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " <u>Gilles v. Davis</u>, 427 F.3d 197, 207 (3d Cir. 2005).

Applying these benchmarks, and viewing the actions of correctional staff in the light depicted by the videotapes, we find that the defendants are entitled to qualified immunity in this case. Nothing in the measured and restrained conduct depicted in the videos could have alerted these officials that their actions violated "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Moreover, the duration of McCullon's detention in restraints fell well within the 24 hour time frame which had previously and repeatedly been recognized as a discrete period of time which did not give rise to constitutional concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10-CV-927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08-CCV-629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa. 2009)(19 hours or more in restraint chair). Therefore these officials should be entitled to qualified immunity from damages in this case.[2]

_____

[2]Having reached these conclusions and recommendations we decline to address the issue of administrative exhaustion raised by the defendants in their summary judgment motion, beyond observing that factual disputes concerning whether staff at Springfield inadvertently delayed receipt of McCullon's grievance appeal may preclude summary judgment in this matter on these grounds. We also

## III.    Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the

defendants' motion for summary judgment (Doc. 18) be GRANTED.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen
(14) days after being served with a copy thereof. Such party shall file
with the clerk of court, and serve on the magistrate judge and all parties,
written objections which shall specifically identify the portions of the
proposed findings, recommendations or report to which objection is
made and the basis for such objections. The briefing requirements set
forth in Local Rule 72.2 shall apply. A judge shall make a de novo
determination of those portions of the report or specified  proposed
findings or recommendations to which objection is made and may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis of
that record. The judge may also receive further evidence, recall witnesses
or recommit the matter to the magistrate judge with instructions.

Submitted this 4th day of March, 2013.

---

decline defendants' invitation to apply the favorable termination rule to this case
based upon the outcome of disciplinary proceedings against McCullon, since in our
view that favorable termination rule would not apply to excessive force claims like
those made here. See Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997).

_S/Martin C. Carlson_
Martin C. Carlson
United States Magistrate Judge